UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

MARTA VALENTIA RIVERA
MADERA, *et al.*,

      Plaintiffs,                      Case No. 1:18-cv-00152-MW-GRJ

v.

KENNETH DETZNER, *et al.*,

      Defendants.

_____/

## SECRETARY'S MOTION TO DISMISS AND RESPONSE IN OPPOSITION TO REQUEST FOR PRELIMINARY INJUNCTION

### I.     INTRODUCTION

The Secretary supports expanding access to election-related materials for *all* Floridians, including those whose first language is not English. [1]  The Florida Department of State already creates and makes available voter materials in both English and Spanish.   But the Secretary cannot compel other elected state constitutional officers to do the same.  This close to the General Election he also cannot support the Plaintiffs' request for expansive relief against 32 separate counties, each with separate budgets, demographics, ballot styles, ballot designs,

_____

[1] This combined Motion and Response refers to the Florida Secretary of State, Kenneth Detzner, as "Secretary," the 32 affected counties and the Secretary collectively as "the Defendants," the Plaintiffs collectively as "the Plaintiffs," the named individual Plaintiff as "Ms. Madera," and the filings before this Court as "ECF" followed by the appropriate pin-citation.

1

ballot machinery, vendors, election-day protocols, and other constraints. The Secretary is mindful of the Plaintiffs' concerns, but he must move to dismiss the complaint and oppose the preliminary injunction.

Dismissal of the Complaint as it relates to the Secretary is appropriate for three distinct but related reasons. *First*, the Plaintiffs cannot satisfy the causation element for Article III standing. The Plaintiffs neither allege that the Secretary has caused them any harm nor can they. Voting is more accessible for the Plaintiffs because the Secretary makes Spanish-language voter assistance and materials available to them and others. *Second*, because the Secretary has no responsibility or authority to direct locally-elected officials to comply with *federal* election law, sovereign immunity applies. Sovereign immunity, confirmed through the Eleventh Amendment, bars the Plaintiffs from suing the Secretary. *Third*, the Plaintiffs fail to state a claim for the expansive injunctive relief they seek under § 4(e) of the Voting Rights Act; they provide specific allegations only as to Alachua County but seek relief in 31 other counties as well. This Court should thus dismiss the complaint as to the Secretary.

A preliminary injunction is not appropriate either. The Plaintiffs cannot show likelihood of success on the merits or irreparable harm because they simply do not plead facts sufficient for relief in all 32 named counties. Importantly, the Plaintiffs also waited too long to ask for preliminary relief. Based on the

2

allegations in the Plaintiffs' complaint and supporting materials, the Plaintiffs could have sued as early as 2016.  They could have also sought injunctive relief in April 2018 when they sent letters raising concerns under § 4(e) of the Voting Rights Act.  It is now too late.  With the first ballots for the General Election expected to be mailed on or before September 22, 2018, the 32 counties at issue do not have time or ability to provide the relief the Plaintiffs seek.  The equities and public interest weigh against the preliminary injunction.

## II.    THIS COURT SHOULD DISMISS THE COMPLAINT FOR THREE DISTINCT BUT RELATED REASONS.

While the Plaintiffs' goals are laudable, this Court should still dismiss the complaint as to the Secretary.  Federal Rule of Civil Procedure 12(b)(1) provides a basis to dismiss for lack of standing.  *See, e.g., Sinaltrainal v. Coca-Cola Co.,* 578 F. 3d 1252, 1260 (11th Cir. 2009).  Rule 12(b)(1)–(2) or (6)–(7) provide a basis to dismiss on sovereign immunity grounds.  *See generally* Calvin Cohen, *How to Assert State Sovereign Immunity Under the Federal Rules of Civil Procedure,* 69 Vand. L. Rev. 761, 774–89 (2016) (discussing same).  Rule 12(b)(6) allows this Court to dismiss the complaint for a failure to state a claim.

### A.    The Plaintiffs cannot satisfy the causation element for Article III standing as it relates to the Secretary.

The Plaintiffs must have Article III standing to sue *each* of the Defendants for the claims they now assert.  *See Calzone v. Hawley,* 866 F.3d 866, 869 (8th Cir.

2017) (citing *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–61 (1992)). "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan,* 504 U.S. at 560. These three elements require the Plaintiffs to show that: (1) they have suffered an injury in fact that is concrete and particularized, actual and imminent — not one that is conjectural or hypothetical;[2] (2) each Defendant caused that injury such that the injury is fairly traceable to each Defendant's challenged actions; and (3) it is likely, as opposed to speculative, that a favorable decision by this Court would redress the injury. *Id.* at 560–61. The Plaintiffs cannot satisfy the causation element as it relates to the Secretary for two reasons.

*First*, the complaint details the regrettable burdens that some of Florida's Spanish-speaking community must overcome in the 32 counties at issue; however, there is no allegation that the Secretary imposed these burdens. Perhaps recognizing that the Secretary creates and makes available Spanish-language voter materials at the state level, the complaint relates exclusively to decisions made by local elections officials and faults the 32 counties as follows:

- "If the [32] Counties' registration materials and assistance, voting guides, voting instructions, ballots or ballot labels on voting

---

[2] An organization suffers an injury in its own rights "if the [D]efendant's illegal acts impairs its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *Fla. State Conference of NAACP v. Browning,* 522 F.3d 1153, 1165 (11th Cir. 2008).

machines, and other election materials are provided only in English, the [Plaintiffs'] ability to vote effectively will be seriously impaired." ECF 1 at ¶ 57.

- "The [32] Counties in the [putative] defendant class conduct English-only elections and do not provide Spanish-language ballots, or sufficient other Spanish-language election materials or assistance." *Id.* at ¶ 59.

- "By not providing Spanish-language ballots or sufficient other Spanish-language election materials and assistance, the [32] Counties condition the [Plaintiffs'] right to vote of on their ability to read, write, understand, or interpret the English language." *Id.* at ¶ 60.

- "Although many of the [32] Counties have been repeatedly requested to do so, the [32] Counties will not and/or have not made binding commitments to provide Spanish-language ballots or sufficient Spanish-language registration and other election materials or assistance at the polls for the upcoming November 2018 general election." *Id.* at ¶ 61.

- "[T]he [32] Counties have stated that they will not provide Spanish-language ballots for the 2018 elections. In addition, none

of the Counties has formally committed to provide sufficient Spanish-language election materials and assistance for the 2018 elections." *Id.* at ¶ 64.

- "If the [32] Counties do not provide Spanish-language ballots, other election materials, and assistance for the 2018 and subsequent Florida elections, [the Plaintiffs] will effectively be disenfranchised." *Id.* at ¶ 65; *see also* ECF 2 at 8 n. 6 ("But it is the counties – not the State – that prepare and distribute the county-specific ballots and the machines used to vote on election day.") (citing §§ 101.20-101.21, Fla. Stat.)

Ultimately then, all of the alleged harms are "the result [of] the independent action of some third party," namely the individual county supervisors of elections, and so there is no causal connection to the Secretary. *Lujan,* 504 U.S. at 560–61 (alteration in original). The Eleventh Circuit came to a similar conclusion in *Hollywood Mobile Estates, Limited v. Seminole Tribe,* 641 F.3d 1259, 1264–67 (11th Cir. 2009), when it held that the plaintiff lessor did not satisfy the causation element as to the Secretary of the Interior in a dispute over a 55-year lease it entered into with the Seminole Tribe of Florida. There, the plaintiff entered into the lease with the Secretary's approval; the parties modified the lease, with the Secretary's approval each time; and the Secretary was alleged to have "overall

6

responsibility." *Id.* at 1263. But critically, as here, the plaintiff "failed to allege an action of the Secretary that had caused [the plaintiff] any injury." *Id.* at 1265; *see also Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 41–46 (1976) (holding that indigent patients suing treasury officials could not satisfy the causation element as it was "purely speculative whether the denials of [hospital] service specified in the complaint fairly can be traced to [officials'] 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications").

*Second*, readily available facts make plain that the Secretary and his Division of Elections actually *ease* the burdens that Florida's Spanish-speaking voters must overcome; they do not cause them. Among other things, the Secretary and his Division of Elections provide statewide voter assistance and voter fraud hotlines. Exh. 1 (Matthews Dec.) at ¶ 5. Staffed Monday through Friday, from 8:00AM-5:00PM Eastern, these hotlines have Spanish-speakers available *at all times* for Floridians who prefer to speak Spanish. *Id.* at ¶ 5. The Secretary and his Division also provide a Spanish-language voter registration application with detailed instructions, and the contact information for each of Florida's 67 supervisors of elections. *Id.* at ¶ 4a. The Secretary and his Division make Spanish-language voter complaint forms and voter guides available; provide Spanish-language booklets specific to the numerous proposed constitutional amendments, as they may appear on the Florida ballot; and print and distribute to

all counties Spanish-language notices concerning offices open for qualifying, and polling place notices. *Id.* at ¶ 4.b-e. Taken together, these actions make it easier, not harder, for the Plaintiffs to vote in Spanish. The Secretary thus helps ameliorate any harms; he does not cause them in any way, and the Plaintiffs do not allege otherwise. *See id.*

The Plaintiffs lack Article III standing as it relates to the Secretary because they cannot satisfy the causation element.

### B. Sovereign immunity applies and bars the Plaintiffs' claims against the Secretary.

Sovereign immunity provides a separate basis for dismissal.[3] Immunity from suit is "a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution." *N. Ins. Co. of N.Y. v. Chatham Cty.,* 547 U.S. 189, 193 (2006). Immunity "derives not from the Eleventh Amendment but from the structure of the original Constitution." *Alden v. Maine*, 527 U.S. 706, 728 (1999). The "Eleventh Amendment [simply] confirm[s] . . . sovereign immunity as a constitutional principle." *Id.* at 728–29. This immunity precludes federal lawsuits against the states, their agencies, and their departments. *See N. Ins. Co. of N.Y.,* 547 U.S. at 193. But, consistent with the U.S. Constitution's

---

[3] Because no court has addressed, and the Plaintiffs do not raise, the question of whether Congress abrogated sovereign immunity through § 4(e) of the Voting Rights Act, the Secretary does not address the issue either. The Secretary does so without waiving the issue and respectfully reserves the right to respond should the Plaintiffs raise the issue or should this Court require briefing on the issue.

Supremacy Clause, the U.S. Supreme Court has long recognized an exception for suits "challenging the constitutionality of a state official's action in enforcing *state law*" in a manner that violates federal law.  *Green v. Mansour,* 474 U.S. 64, 68 (1988) (citing *Ex parte Young,* 209 U.S. 123, 159–60 (1908)).  This legal fiction — this *Young* exception — treats officers of the State as if they act on behalf of the State but "without the State's authority, and, hence, without immunity protection, when they enforce *state laws* in derogation of [federal laws]."  *Summit Med. Assocs., v. Pryor,* 180 F.3d 1326, 1336–37 (11th Cir. 1999) (emphasis added).

The *Young* exception does not apply here.  The exception depends on the state official having "power by virtue of his office" that "sufficiently connect[s] him with the duty of enforcement" of state law or state policy in a manner that violates federal law.  *Ex parte Young,* 209 U.S. at 161.  The Secretary has no power under state law to compel 32 separately elected constitutional officers to comply with *federal law*.  And the Secretary has taken no actions to enforce *state law* in a manner that violates § 4(e) of the Voting Rights Act.  He cannot.

Section 15.13 of the Florida Statues gives the Florida Department of State "general supervision and administration of the election law. . . as are placed under it by the [Florida] Legislature," *not* the U.S. Congress.  Section 97.012(1) gives the Secretary the responsibility to "[o]btain and maintain uniformity in the interpretation and implementation of [state] election laws" in "chapters 97 through

102 and 105 of the Election Code" through rulemaking under the Florida law, *not* through federal rulemaking.  Section 97.012(14) allows the Secretary to "[b]ring and maintain such actions at law or in equity by mandamus or injunction [in state circuit court] to enforce the performance of any duties of a county supervisor of elections . . . with respect to chapters 97 through 102 and 105 or to enforce compliance with a rule of the Department of State," *not* bring actions in federal court under federal law.  Section 97.012(16) allows the Secretary to "[p]rovide written direction and opinions to the supervisors of elections on the performance of their official duties with respect to the Florida Election Code or rules adopted by the Department of State," *not* directions or opinions concerning federal law.  Rule 1S-2.032(3) of the Florida Administrative Code merely tells supervisors to follow the law and court orders; "does not prohibit a supervisor of elections from including one or more other [ballot] languages as he or she determines is necessary to accommodate the respective electorate" in a county; and, consistent with § 101.151(8) of the Florida Statutes, directs supervisors to ask the U.S. Department of Justice for guidance on multi-language ballot requirements.[4]

Because the Secretary has neither the power to compel compliance with federal law nor is there an allegation that he has taken action under state law

---

[4] Sections 97.012 (7), (9), (10), and (11) of the Florida Statutes make it the Secretary's "responsibility" to coordinate compliance with certain tasks under federal law.  Directing comprehensive election reform in 32 counties under § 4(e) of the Voting Rights Act is not listed among these specific responsibilities.

inconsistent with federal law, the *Young* exception does not apply.  *See Summit Med. Assocs.,* 180 F.3d at 1341–42 ("[U]nless the state officer has some responsibility to enforce the [state] statute or [state] provision at issue, the 'fiction' of *Young* cannot operate" and "courts have refused to apply *Ex parte Young* where the officer who is charged has no authority to enforce the challenged statute").

Neither *Grizzle v. Kemp,* 634 F.3d 1314 (11th Cir. 2011) nor *Florida Democratic Party v. Detzner,* 2016 U.S. Dist. LEXIS 143620 (N.D. Fla. 2016) requires a contrary result.  Both cases concerned the exercise of the respective secretaries of state's responsibilities under *state law* in a manner that was alleged to have violated the U.S. Constitution.  In *Grizzle,* the plaintiffs sued the Georgia Secretary of State to challenge Georgia's anti-nepotism provision for violating the First and Fourteenth Amendments to the U.S. Constitution.  634 F.3d at 1317. After reciting the Georgia Secretary of State's broad responsibilities under Georgia law, the Eleventh Circuit concluded that Georgia law sufficiently "imbue[d] him with the responsibility to enforce [Georgia's anti-nepotism provision] at issue in the suit" for the *Young* fiction to apply.  *Id.* at 1319.  This Court came to a similar conclusion about the Florida Secretary of State's responsibility, under Florida law, to bring Florida's vote-by-mail signature requirements into compliance with the First and Fourteenth Amendments to the U.S. Constitution.  *Fla. Dem. Party,* 2016 U.S. Dist. LEXIS 143620, at *12–17.

11

Unlike *Grizzle* and *Florida Democratic Party*, here the Plaintiffs' claims against the Secretary are not tethered to a provision of *state law* that the Secretary is alleged to be implementing (or failing to implement) in a manner that violates federal law. The Plaintiffs seemingly assert that the Secretary has an affirmative duty to act under a federal statute – and only that federal statute. This cannot be. The Secretary is not a federal official. The Secretary is not a conduit for federal action. Importantly, state law imbues the Secretary with no authority here.

Sovereign immunity, confirmed through the Eleventh Amendment, applies.

### C.    The Plaintiffs fails to state a claim for expansive relief they seek in 32 Florida counties.

Assuming that the Plaintiffs have standing to sue the Secretary and the *Young* exception applies, this Court should still dismiss the Plaintiffs' complaint for failure to state a claim against the Secretary. Federal Rule of Civil Procedure 8(a) mandates that the Plaintiffs must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8 (a)(2). The "obligation to provide the grounds of . . . entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "It is not . . . proper to assume that [the Plaintiffs] can prove facts that [they] ha[ve] not alleged." *Id.* at 563 n.8 (alterations in original). And where, as here, the complaint seeks injunctive relief, the "[i]njunctive relief . . . must be narrowly tailored to

remedy the specific harm alleged," *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976), because "the scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki,* 442 U.S. 682, 702 (1979).   Federalism principles make tailoring especially important where relief is sought against a state or local government. *See Rizzo v. Goode*, 423 U.S. 362, 378–79 (1976).

The Plaintiffs' complaint falls short of the mark for stating a claim for relief. Plaintiffs brought this action for injunctive relief under section 4(e) of the Voting Rights Act.  Section 4(e) provides that:

> No person who demonstrates that he has successfully completed the sixth primary grade in a public school in, or a private school accredited by, any State or territory, the District of Columbia, or the Commonwealth of Puerto Rico in which the predominant classroom language was other than English, shall be denied the right to vote in any Federal, State, or local election because of his inability to read, write, understand, or interpret any matter in the English language.

52 U.S.C. § 10303(e)(2).  The statute's plain language requires the Plaintiffs to allege that:  (1) a person who attended primary school in which the predominant language was other than English, (2) has been denied the right to vote, (3) because of the inability to read, write, understand, or interpret the English language.

Even accepting the allegations of the complaint as true and construing them favorably to the pleader, the Plaintiffs state a claim for relief under section 4(e) *only* with respect to the individual plaintiff, Ms. Madera, arising out of her alleged

inability to exercise her right to vote in Alachua County.  As to the 31 counties other than Alachua, the complaint generally alleges that "[t]he Counties are each home to a substantial population of citizens who are eligible to vote, attended school in Puerto Rico in which the classroom language was predominately Spanish, and are unable to vote effectively in English."  ECF 1 at ¶ 49.  But this general allegation is based on census "estimates" of adults "of Puerto Rican heritage" who are not proficient in English.  *Id.* at ¶ 50.   Because such estimates say nothing about the schools any such adults attended, the complaint asks this Court to assume that "[m]any of these individuals attended at least some school in Puerto Rico in which the primary language of instruction was not English[.]"  *Id.* at ¶ 51.  Yet this Court cannot "assume" facts concerning the percentage of Puerto Ricans who are not proficient in English, who attended some school in Puerto Rico, who were instructed in a language other than English, and who now live in the 32 affected Florida counties.  *Bell Atl. Corp.,* 550 U.S. 563 n.8.

Moreover, other than the allegations pertaining to Ms. Madera, the complaint includes no specific allegations as to the number or identity of aggrieved persons who may be entitled to relief in any specific county.  Thus, the kind of comprehensive election reforms the Plaintiffs seek far exceed the specific harms they allege.  This, in turn, makes the injunctive relief they seek improper as to at

least 31 of the affected Florida counties.  *See Califano,* 442 U.S. at 702; *Rizzo,* 423 U.S. at 378–79; *Aviation Consumer Action Project,* 535 F.2d at 108.

The reported cases concerning violations of section 4(e) of the Voting Rights Act confirm that the relief the Plaintiffs' seek is overbroad.  Relief in each case was tailored to address specific harms allegedly caused by the responsible election officials in a single geographic location.  *See Perez-Santiago v. Volusia Cty.*, 2009 U.S. Dist. LEXIS 75350 (M.D. Fla. Aug. 25, 2009) (Volusia County, FL); *United States v. Berks Cty.*, 250 F. Supp. 2d 525 (E.D. Pa. 2003) (Berks County, PA); *Torres v. Sachs*, 381 F. Supp. 309 (S.D.N.Y. 1974) (New York City); *Puerto Rican Org. for Political Action v. Kusper*, 350 F. Supp. 606 (N.D. Ill. 1972) (Chicago).

The Plaintiffs' complaint fails to state a claim against the Secretary for the relief they now seek.

## III.   THIS COURT SHOULD DENY THE PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION.

Separately, this Court should deny the Plaintiffs' request for preliminary injunction. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites."  *Keister v. Bell,* 879 F.3d 1282, 1287 (11th Cir. 2018) (collecting citations).  The four requisites the

Plaintiffs "must clearly establish" are:  "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the [P]laintiff[s] outweighs the potential harm to the [D]efendant; and (4) that the injunction will not disservice the public interest." *Id.* (citations omitted). Notably, the rule governing preliminary injunctions "does not place upon the non-moving party the burden of coming forward and presenting its case against a preliminary injunction." *Ala. v. U.S. Army Corps of Eng'rs,* 424 F.3d 1117, 1136 (11th Cir. 2005) (quoting *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70,* 415 U.S. 423, 442 (1974)).

> ### A.   The Plaintiffs cannot *clearly establish* likelihood of success, need for expansive relief across 32 Florida counties, or irreparable harm.

The Plaintiffs have not "clearly establishe[d]" a likelihood of success against the Secretary or irreparable harm. *Keister,* 879 F.3d at 1287.  Again, § 4(e) of the Voting Rights Act requires that the Plaintiffs prove that (1) a person who attended primary school in which the predominant language was other than English, (2) has been denied the right to vote, (3) because of the inability to read, write, understand, or interpret the English language.  52 U.S.C. § 10303(e)(2).  The Plaintiffs must further show that the relief they seek — comprehensive reforms in 32 counties — is tailored to the harms alleged in each of those counties. *See Califano,* 442 U.S. at 702; *Rizzo,* 423 U.S. at 378-79.

16

In support of their argument on the merits and their showing of irreparable harm, the Plaintiffs rely primarily on the declaration of Dan Smith, a political science professor at the University of Florida.  Mr. Smith's declaration is flawed, and fails to provide competent evidence.

Mr. Smith, a political scientist, has no obvious expertise in the Puerto Rican diaspora, the Puerto Rican educational system, statistics, demographics, or linguistics.  Mr. Smith relies only on data from the U.S. Census Bureau, the Division of Elections, material he obtained in July of this year from a third-party, and his own suppositions.  *E.g.,* ECF 2-2 at ¶¶ 7, 8, 10, 18 and n.9, 23 and n.10-14.

Mr. Smith begins his analysis by compiling the U.S. Census Bureau's 2011-15 "demographics and housing unit *estimates,*" which are "based on a sample and are subject to a *degree of uncertainty.*"  *Id.* at ¶ 10 and n.2.  From this, he "*estimate[s]*" that 30,302 "adults of Puerto Rican heritage who speak Spanish at home," "speak English at proficiency levels less than 'very well,'" and reside in the 32 counties at issue.  *Id.* at ¶ 13 (emphasis added).  Then, without any other supporting material, Mr. Smith leaps to the conclusion that "[i]n his opinion . . . it is *more likely than not* that a substantial percentage of U.S. citizens of Puerto Rican heritage living in Florida who are 18 and older attended some school in Puerto Rico," and cannot vote in English.  *Id.* at ¶ 15 (emphasis added).  He goes on to opine about the difficulties citizens face in registering to vote, *see id.* at ¶¶

17

16-21, and the tragedies many endured during Hurricane Maria before migrating to Florida and making Florida their home. *Id.* at ¶¶ 22-24.

An estimate derived from an estimate, subject to a degree of uncertainty, and rooted in a bald and unsupported leap cannot "clearly establish" anything, much less entitlement to preliminary relief across 32 Florida counties. *Keister,* 879 F.3d at 1287; *see also Califano,* 442 U.S. at 702; *Rizzo,* 423 U.S. at 378–79. The Plaintiffs' conclusions are especially concerning when one considers that the U.S. Census Bureau asks respondents whether they speak English "very well" or "well," showing that Mr. Smith simply assumes that even someone who speaks English "well" cannot vote in English. *See* U.S. Census Bureau, Language Use: Frequently Asked Questions.[5] Mr. Smith also glosses over the fact that Puerto Rican schools teach English as a mandatory second language; *see* P.R. Regs. DE REG. 8115, Art. III, § B; ECF 2 at n.4; that 21.9 % of all Puerto Ricans over age 5 speak English only or speak English "very well;"[6] that 32.7% of the residents of

---

[5] Available at https://www.census.gov/topics/population/language-use/about/faqs.html. (last visited 8/29/18).

[6] U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates, available at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_16_5YR_S1601&prodType=table (last visited 8/29/18) (select add/remove geographies and view Puerto Rico).

San Juan over the age of 5 speak English only or speak English at least "well;"[7] and fails to consider whether the English proficiency of Florida's Puerto Rican diaspora since Hurricane Maria may be greater than those surveyed by the U.S. Census Bureau in 2011-2015. *See, e.g.,* Carmen Sesin, *I'm staying: Months after Maria, Puerto Ricans settle in Florida,* NBC News (Mar. 14, 2018);[8] Oren Dorell, *Who will rebuild Puerto Rico as young professionals leave island after Hurricane Maria?,* USA Today (Oct. 12, 2017).[9]

The Plaintiffs have thus failed to provide competent evidence as to each element of their claim. Specifically, they have failed to provide competent evidence showing that (1) people in 32 Florida counties attended primary school in which the predominant language was other than English, (2) have been denied the right to vote by these 32 counties, (3) because of their inability to read, write, understand, or interpret the English language. The Plaintiffs have also failed to

---

[7] U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates, available at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_16_5YR_S1601&prodType=table (last visited 8/29/18) (select add/remove geographies and filer by Principal City, then San Juan-Carolina-Caguas, PR, then San Juan zona urbana).

[8] Available at https://www.nbcnews.com/news/latino/i-m-staying-months-after-maria-puerto-ricans-settle-florida-n851826 (last visited 8/29/18).

[9] Available at https://www.usatoday.com/story/news/nation/2017/10/12/puerto-rico-young-professionals-leaving-hurricane-maria/754753001/ (last visited 8/29/18).

justify their request for comprehensive relief in all 32 counties as being tailored to the harms in each of the 32 counties at issue.

The Plaintiffs have not shown likelihood for success on the merits or irreparable harm in all 32 counties.

### B.   The Plaintiffs cannot *clearly establish* that the equities and the public interest favor a preliminary injunction.

In addition, the equities and public interest decidedly favor the Defendants, including the Secretary.  Delay by the Plaintiffs in filing their lawsuit and seeking preliminary relief ultimately prejudices the Defendants who have just held one election (the Primary Election) and are preparing for another election (the General Election).  By extension, this undermines the public interest and expectation in ensuring a successful election cycle.  "Call it what you will — laches, the *Purcell* principle, or common sense — the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so."  *Crookston v. Johnson,* 841 F.3d 396, 398 (6th Cir. 2016) (citing *Purcell v. Gonzalez,* 549 U.S. 1, 5–6 (2006));[10] *see*

---

[10] In *Crookston*, the Sixth Circuit stayed a district court's preliminary injunction, which the plaintiff requested approximately 5 weeks before the November 2016 General Election so that he could take a selfie with his ballot.  *Id.* at 399.  In *Conservative Party of New York State v. New York State Board of Elections,* 2010 U.S. Dist. LEXIS 114155, at *2 (S.D.N.Y. 2010) the district court similarly denied a preliminary injunction where the plaintiffs waited until 6 weeks before an election to file their action.  In *Silberberg v. Board of Elections of New York,* 216 F. Supp. 3d 411, 420 (S.D.N.Y. 2016) the district court denied a late-filed action for fear of the disruption.  In June of this year, the U.S. Supreme Court held that the balance of equities did not weigh in favor of a request for a preliminary

also *Winter v. NRDC, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 376-77 (2008) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.").

1. <u>The Plaintiffs' delay in filing suit and seeking preliminary relief weighs against them.</u>

*First*, the delay:  The Plaintiffs could have filed their action much sooner. The impetus for this lawsuit appears to be the arrival of Puerto Ricans to Florida after Hurricane Maria devastated the island in September 2017.  ECF 1 at 53.  So the arguments the Plaintiffs now raise could have been raised last fall or winter, or well before then, considering Mr. Smith's use of U.S. Census Bureau data from 2011-15 that became available in late 2016.[11]  ECF 2-2 at ¶ 10.  But the Plaintiffs waited until days before the Primary Election and only weeks before the General Election to file their complaint and seek a preliminary injunction.  *See* ECF 1 and 2.[12]  If imminence is at all a factor when considering requests for preliminary

---

injunction in an election law case where the plaintiffs did not demonstrate reasonable diligence in requesting injunctive relief.  *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018).

[11] The American Community Survey 5-year estimate is conducted on a rolling basis.  Results are released in December for the previous year.  *See* https://www.census.gov/programs-surveys/acs/news/data-releases/2015/release-schedule.html

[12] Even assuming the Plaintiffs had some obligation to negotiate with the Defendants before filing suit, which they did not, they could have filed suit months ago after their outreach to the Defendants ceased.  *See, e.g.* ECF 3-42 (June letter to Leon County Supervisor Mark Earley).

injunctions, then the time for preliminary relief has passed. *See Benisek*, 138 S. Ct. at 1944 (2018) ("In considering the balance of equities among the parties, we think that plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request."); *Wreal, Ltd. Liab. Co. v. Amazon.com,* 840 F.3d 1244, 1246 (11th Cir. 2016) (affirming denial of preliminary relief where "the plaintiff pursued its preliminary injunction motion with the urgency of someone out on a meandering evening stroll rather than someone in a race against time").

2.  *The consequences of delay harm the Defendants and undermine the public interest.*

*Second,* the consequences of the delay:  the Secretary and Florida's 67 local supervisors of elections are currently wrapping-up the August 28 Primary Election and are engaged in preparations for upcoming November 6 General Election.  Over the next few weeks, supervisors must meet a series of statutory deadlines.[13]  Many of these deadlines overlap and several are inflexible. Exh. 8 at ¶ 12.a (Highlands County).  Supervisors must, for example, mail ballots to absent uniformed and overseas absentee voters no later than September 22, 2018.   Exh. 1 at ¶ 12 (Matthews Dec.); *see also* § 101.162, Fla. Stat.  Failure to timely mail these ballots could expose supervisors to federal criminal liability. *See* 18 U.S.C. § 608.  In addition to meeting statutory deadlines, supervisors and their staff are engaged in

---

[13] *See* Exh. 3 at ¶ 14 (Citrus County); Exh. 2 at ¶ 5 (Bay County); Exh. 5 at ¶ 3 (Duval County).

preparations for the General Election.[14]  They are working 12–14 hour days and are stretched thin.  *See, e.g.* Exh. 6 at ¶ 4 (Flagler County).

The Plaintiffs now ask this Court to impose new mandates late in the election cycle.  *See* ECF 2-10 at  ¶ ¶ 1-13.  Such late changes pose "a huge risk" because "[c]hanges in th[e] [election administration] process require time and planning" to properly implement.  Exh. 12 at ¶ 10 (Manatee County).

As a general matter, supervisors and their staff would have to make still more time to satisfy both the existing mandates, and then consider and plan to implement the new mandates.  *See, e.g.* Exh. 6 at ¶ 4(Flagler County).  To do all this, supervisors would need to petition their respective boards of county commissioners for funds[15] because budgets for the upcoming General Election were set months ago and did not account for the relief the Plaintiffs now seek.[16]

As to the specific relief the Plaintiffs seek, providing Spanish-language versions of the official ballots in 32 counties would be impossible for this General Election.  *See* ECF 2-10 at ¶ 2 (requesting same).   Supervisors have less than two

---

[14] For a description of these activities, see Exh. 2 at ¶ 4 (Bay County); Exh. 12 at ¶ 3 (Manatee County); Exh. 14 at ¶ 3 (Monroe County); Exh. 18 at ¶ 3 (Putnam); Exh. 3 at ¶ 7-13 (Citrus County).

[15] *See, e.g.* Exh. 6 at ¶ 8.a (Flagler County);  Exh. 17 at ¶¶ 7-8 (Pasco County).

[16] Exh. 2 at ¶ 11 (Bay County);  Exh. 4 at ¶ 7.a (Columbia County); Exh. 6 at ¶ 8.a (Flagler County);   Exh. 11 at ¶ 4 (Levy County);   Exh. 12 at ¶ 7.c (Manatee County); Exh. 14 at ¶ 10 (Monroe County); Exh. 16 at ¶ 6 (Okeechobee County); Exh. 17 at ¶¶ 15, 17 (Pasco County); Exh. 3 at ¶¶ 5-6 (Citrus County); Exh. 21 at ¶9 (Sumter County).

weeks from the time that the State certifies the results of August 28 Primary Election to prepare final ballots to meet the September 22, 2018 deadline for mailing absent stateside uniformed and overseas ballots. Exh. 1 at ¶ 6 (Matthews Dec.). In these two weeks, the supervisors would need to locate and hire certified translators, obtain funding from their respective county boards, translate the final ballot for each ballot-style used in their counties, proof the ballots for each ballot-style, print the ballots, and coordinate with outside vendors as necessary.[17] Because there are a limited number of vendors authorized to prepare ballot materials, Exh. 14 at ¶ 8.a (Monroe County), counties using outside vendors might find it difficult to print additional ballots or replace their existing ones.[18] Transporting and storing the additional ballots would present another problem.[19] The Counties would need to reprogram their voting equipment or software to accommodate the new ballots,[20] and make these changes compliant with the

---

[17] Exh. 15 at ¶ 11 (Okaloosa County); Exh. 12 at ¶ 7.b (Manatee County); Exh. 21 at ¶ 7.a-d (Sumter County); *see also* Exh. 5 at ¶ 8.a-d (Duval County) (Duval County must send ballots to the printer by September 10); Exh. 6 at ¶ 8.a (Flagler County); Exh. 7 at ¶ 6 (Hernando County) (sent out as soon as certified results are received); Exh. 10 at ¶ 7.c (Lake County).

[18] *See, e.g.* Exh. 2 at ¶ 6-7 (Bay County); Exh. 6 at ¶ 8.a (Flagler County); Exh. 12 at ¶7.b.iv (Manatee County); Exh. 20 at p. 3 (Santa Rosa County).

[19] *See, e.g.* Exh. 2 at ¶ 8.c (Bay County); Exh. 9 at ¶ 8.c (Jackson County).

[20] *See, e.g.* Exh. 15 at ¶ 11 (Oklaoosa County); Exh. 17 at ¶ 8 (Pasco County); Exh. 18 at ¶ 7a (Putnam County); Exh. 21 at ¶ 7.f (Sumter County).

Americans with Disabilities Act.[21] This process would take several weeks as the Counties coordinate with vendors on programming, and then submit changes to the Division of Elections for testing and certification that is unlikely to be complete until after the General Election.[22]

It is similarly infeasible for all 32 counties to provide Spanish-language translations of other election materials, such as voter education guides, instructions and signage, and Spanish-language translations of their websites. ECF 2-10, at ¶¶ 1-7, 10 (requesting same).  While some counties already provide some or all materials and their websites in Spanish,[23] many lack funding to provide

---

[21]  *See, e.g.* Exh. 20 at p. 3 (Santa Rosa County); Exh. 6 p. 7 (Flagler County); Exh. 7 at ¶ 21 (Hernando County).

[22]  Twenty-two of the Counties use ES&S as a vendor for vote tabulation equipment, while the remaining 10 Counties use Dominion.  Exh. 1 (Matthews Declaration) at Attachment 2, page 53.  ES&S estimates it would take "several weeks" to reprogram the equipment, Exh. 17 at ¶ 8 (Pasco County), while Dominion estimates it would take 3 weeks.  Exh. 18 at ¶ 7a (Putnam County). *See also* Exh. 18 at ¶ 7.a (Putnam County); Exh. 14 at ¶ 8.a (Monroe County); Exh. 17 at ¶ 8 (Pasco County); Exh. 1 at ¶ 18 (Matthews Declaration); Exh. 14 at ¶ 8.a (Monroe County).

[23]  Exh. 5 at ¶ 5 (Duval County);  Exh. 6 at ¶ 6 (Flagler County); Exh. 7 at ¶ 24 (Hernando County); Exh. 12 at ¶ 5 (Manatee County); Exh. 13 at ¶ 5 (Marion County); Exh. 16 at ¶ 4 (Okeechobee County); Exh. 17 at ¶ 5 (Pasco County).

translations for the upcoming General Election.[24]   Compounding the problem, outside vendors may lack the capacity to complete this project in time.[25]

Hiring, training, and assigning bilingual poll workers for election-day and early voting locations, and hiring and training other bilingual staff, present problems too.   ECF 2-10, at ¶¶ 8-9, 12-13 (requesting same).    While many counties already provide some bilingual poll workers, [26] there is simply not enough time to find and train bilingual workers in all 32 counties the Plaintiffs target.[27] Reasons for this vary from county to county,[28] and the Plaintiffs' formula for calculating the necessary number of bilingual poll workers based on Spanish surnames is unworkable.   *See* ECF 2-10 at ¶ 9.  In Duval County, for example, staff would have to manually review a database of 592,345 registered voters and

---

[24] *See, e.g.* Exh. 13 at ¶ 8.a (Marion County); Exh. 17 at ¶ 12 (Pasco County); Exh. 16 at ¶ 6 (Okeechobee County).

[25] Exh. 5 at ¶ 9 (Duval County); Exh. 6 at ¶ 8.b (Flagler County); Exh. 8 at ¶ 8.a (Highlands County).

[26] *See, e.g.* Exh. 5 at ¶ 5 (Duval County); Exh. 6 at ¶ 6 (Flagler County); Exh. 7 at ¶ 24 (Hernando County); Exh. 12 at ¶ 5 (Manatee County); Exh. 14 at ¶ 5 (Monroe County); Exh. 16 at ¶ 4.g (Okeechobee County); Exh. 17 at ¶ 5.B (Pasco County); Exh. 19 at ¶ 8.b (St. Johns County).

[27] Exh. 14 at ¶ 9.a (Monroe County); Exh. 16 at ¶ 8 (Okeechobee County); Exh. 22 at ¶ 8.b (Wakulla County); Exh. 12 at ¶ 9.b (Manatee County); Exh. 17 at ¶ 13 (Pasco County); Exh. 21 at ¶ 7.b (Sumter County).

[28] Exh. 18 at ¶ 8.a (Putnam County) ("almost impossible" to find sufficient bilingual poll workers given small population of Spanish speakers in Putnam County); Exh. 5 at ¶ 21 (Duval County would need to identify and recruit an additional 225 bilingual poll workers).

attempt to identify "Spanish surnames."  Exh. 5 at ¶ 15 (Duval County). Some smaller counties face their own unique hurdles.  St. Johns County has been home people of Spanish descent for centuries, making "Spanish surnames" a poor proxy for non-English speaking Puerto Rican voters. Exh. 19 at ¶ 8 (St. Johns County). Columbia County would have to terminate an existing staff member to create an opening for a bilingual staffer.   Exh. 4 at ¶ 7.a (Columbia County).

In short, the weeks leading up to an election "are the most tumultuous times in a Supervisor's office."  *Diaz v. Cobb*, 541 F. Supp. 2d 1319, 1327 (S.D. Fla. 2008).  The preliminary relief sought here would have "a needlessly 'chaotic and disruptive effect upon the electoral process."  *Benisek*, 138 S. Ct. at 1945 (quoting *Fishman* v. *Schaffer*, 429 U.S. 1325, 1330 (1976)).  As one supervisor put it, "the integrity of the entire [election] process [could] be jeopardized." Exh. 3 at ¶ 25 (Citrus County); *see also* Exh. 12 at ¶ 10 (Manatee County).

The equities and public interest weigh against the Plaintiffs' request.

## IV.   CONCLUSION

The Secretary works hard to make voting more accessible.  But he too is constrained by the doctrines of standing; his inability to compel locally-elected supervisors of elections to act in compliance with federal law; and the institutional imperative *not* to accede to comprehensive election reforms that threaten to disrupt

an ongoing election cycle.  He thus asks this Court to dismiss the complaint as to him, and deny the preliminary injunction.

***

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULES

The undersigned certifies that this Motion complies with the size, font, and formatting requirements of Local Rule 5.1(C).  The undersigned further certifies that this Motion complies with the word limit in Local Rule 7.1(F); this Motion contains 6,818 words, excluding the case style, signature block, and certificates.

***

Respectfully submitted by:

JESSE DYER (FBN 114593)
  *Assistant General Counsel*
  jesse.dyer@dos.myflorida.com
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building Suite, 100
500 South Bronough Street
Tallahassee, Florida 32399-0250
Phone: (850) 245-6536
Fax: (850) 245-6127

*/s/ Mohammad O. Jazil*
MOHAMMAD O. JAZIL (FBN 72556)
  mjazil@hgslaw.com
GARY V. PERKO (FBN 855898)
  gperko@hgslaw.com
MALCOLM N. MEANS (FBN 0127586)
  mmeans@hgslaw.com
HOPPING GREEN & SAMS, P.A.
119 South Monroe Street, Suite 300
Tallahassee, Florida 32301
Phone: (850) 222-7500
Fax: (850) 224-8551

Dated:  August 30, 2018          ***Counsel for the Secretary of State***

29

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via transmission of a Notice of Electronic Filing through the Court's CM/ECF system to the following on this 30th day of August, 2018:

KIRA ROMERO-CRAFT
(FL SBN 49927)
LatinoJustice PRLDEF
523 West Colonial Drive
Orlando, FL 32804
(321) 418-6354
kromero@latinojustice.org

ESPERANZA SEGARRA
(FL SBN 527211)
JACKSON CHIN
(*pro hac vice forthcoming*)
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, NY 10013
(212) 219-3360
esegarra@latinojustice.org
jchin@latinojustice.org

*Attorneys for Plaintiffs*

STEPHEN P. BERZON
(*pro hac vice forthcoming*)
STACEY M. LEYTON
(*pro hac vice forthcoming*)
MATTHEW J. MURRAY
(*pro hac vice forthcoming*)
CORINNE F. JOHNSON
(*pro hac vice forthcoming*)
MEGAN C. WACHSPRESS
(*pro hac vice forthcoming*)
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151
sberzon@altber.com
sleyton@altber.com
mmurray@altber.com
cjohnson@altber.com
mwachspress@altber.com

*Attorneys for Plaintiffs*

CHIRAAG BAINS*
(*pro hac vice forthcoming*)
Demos
740 6th Street NW, 2nd Floor
Washington, DC 20001
cbains@demos.org
* Not admitted in the District
of Columbia; practice limited
pursuant to D.C. App. R. 49(c)(3).

STUART NAIFEH
(*pro hac vice forthcoming*)
Demos
80 Broad St, 4th Floor
New York, NY 10004
(212) 485-6055
snaifeh@demos.org

*Attorneys for Plaintiffs*

RONALD A. LABASKY
Brewton Plante, P.A.
215 S. Monroe St., STE 825
Tallahassee, FL 32301
(850) 222-7718
rlabasky@blawfirm.net
fsase@bplawfirm.net

JOHN T. LAVIA, III
Gardner, Bist, Bowden, Bust, Dee,
Lavia & Wright, P.A.
1300 Thomaswood Drive
Tallahassee, Florida 32308
jlavia@gbwlegal.com
rhonda@gbwlegal.com

*Attorneys for the FSASE*

KATHERINE ROBERSON-YOUNG
(FL SBN 38169)
Service Employees International Union
11687 NE 18th Dr.
North Miami, FL 33181-3278
(954) 804-2710
katherine.roberson-young@seiu.org

NICOLE G. BERNER
(*pro hac vice forthcoming*)
Service Employees International Union
1800 Massachusetts Ave, NW
Washington, D.C. 20036
(202) 730-7383
nicole.berner@seiu.org

*Attorneys for Plaintiffs Mi Familia
Vota Education Fund and Vamos4PR*

CORBIN FREDERICK HANSON
Alachua County Attorneys Office
12 SE 1ST STREET 2nd Floor
GAINESVILLE, FL 32601
(352) 374-5218
corbin.hanson@fldoe.org

ROBERT CHARLES SWAIN
Alachua County Attorney's Office
12 SE First St.
PO Box 2877
Gainesville, Fl 32602
(352) 374-5218
bswain@alachuacounty.us

*Attorney for Defendant Barton*

/s/ Mohammad O. Jazil
Attorney