# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

MARTA VALENTINA RIVERA
MADERA, on behalf of herself
and all others similarly situated,
FAITH IN FLORIDA, HISPANIC FEDERATION,
MI FAMILIA VOTA EDUCATION FUND,
UNIDOSUS, and VAMOS4PR

       *Plaintiffs*,

V.                          **Case No. 1:18-cv-152-MW/GRJ**

KENNETH W. DETZNER, in his official
capacity as the Florida Secretary
of State, and KIM A. BARTON, in her
official capacity as Alachua County
Supervisor of Elections, on behalf of
herself and similarly situated County
Supervisors of Elections,

       *Defendants.*

_____/

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION IN PART

Here we are again. The clock hits 6:00 a.m. Sonny and Cher's "I Got You Babe" starts playing. Denizens of and visitors to Punxsutawney, Pennsylvania eagerly await the groundhog's prediction. And the state of Florida is alleged to violate federal law in its handling of elections.[1]

---

[1] Phil Connors, portrayed by Bill Murray, experienced a similar phenomenon. GROUNDHOG DAY (Columbia Pictures Corp. 1993).

Puerto Ricans are American citizens. Unique among Americans, they are not educated primarily in English—and do not need to be. But, like all American citizens, they possess the fundamental right to vote. The issue in this case is whether Florida officials, consistent with longstanding federal law, must provide assistance to Puerto Rican voters who wish to vote. Under the plain language of the Voting Rights Act, they must.

This Court has considered, after a hearing on September 5, 2018, Defendant Kenneth Detzner's motion to dismiss, ECF No. 42, and Plaintiffs' motion for preliminary injunction. ECF No. 2. Defendant Detzner's motion is **DENIED**. Having balanced the equities, Plaintiffs' motion is **GRANTED in part** and **DENIED in part**.[2] This Court is issuing this Order on an expedited basis to give the Secretary and the Scott administration ample opportunity to appeal if they seek to block their fellow citizens, many of whom fled after Hurricane Maria devastated Puerto Rico, from casting meaningful ballots.[3]

# I

While lost on some, Puerto Rico is part of the United States. 8 U.S.C. § 1101(a). The American flag has flown over the island since 1898, and its people have been American citizens since 1917. *Arroyo v. Tucker*, 372 F. Supp. 764,

---

[2] This Court will address Defendant Barton's motion to dismiss, as well as the pending motions for class certification, in a separate order after the motions have been fully briefed.
[3] As for Defendant Barton's part, she is already in the process of implementing most or all what this Court orders.

766 (E.D. Pa. 1974) (citing 8 U.S.C. § 1402); *see also* 8 U.S.C. § 1401(a). In 1965, Congress passed the Voting Rights Act. Among its many provisions, the Act establishes and protects the voting rights of citizens educated in Puerto Rico. 52 U.S.C. § 10303(e).[4] Congress explicitly passed this provision to address the Puerto Rican population living outside of Puerto Rico. *Katzenbach v. Morgan*, 384 U.S. 643, 645 n.3 (1966).

Florida has 67 counties. Thirteen counties provide Spanish-language ballots in compliance with another provision of the Voting Rights Act. 52 U.S.C. § 10503(b)(2)(A). This provision requires non-English ballots in political subdivisions where either more than five percent of the voting-age citizenry or more than 10,000 citizens of voting age are members of a single-language minority and have limited proficiency in English.[5] *Id*. Two counties—Collier

---

[4] Section 4(e) in its entirety states:

(1) Congress hereby declares that to secure the rights under the fourteenth amendment of persons educated in American-flag schools in which the predominant classroom language was other than English, it is necessary to prohibit the States from conditioning the right to vote of such persons on ability to read, write, understand, or interpret any matter in the English language.

(2) No person who demonstrates that he has successfully completed the sixth primary grade in a public school in, or a private school accredited by, any State or territory, the District of Columbia, or the Commonwealth of Puerto Rico in which the predominant classroom language was other than English, shall be denied the right to vote in any Federal, State, or local election because of his inability to read, write, understand, or interpret any matter in the English language, except that in States in which State law provides that a different level of education is presumptive of literacy, he shall demonstrate that he has successfully completed an equivalent level of education in a public school in, or a private school accredited by, any State or territory, the District of Columbia, or the Commonwealth of Puerto Rico in which the predominant classroom language was other than English. 52 U.S.C. § 10303(e).

[5] Those counties are Broward, DeSoto, Hardee, Hendry, Hillsborough, Lee, Miami-Dade, Orange, Osceola, Palm Beach, Pinellas, Polk, and Seminole. 81 Fed. Reg. 87534–35 (2016).

and Volusia—are not required to provide Spanish-language election materials to comply with this provision, but they do anyway. ECF No. 2, Ex. 3, at ¶ 6, Ex. 4, at ¶¶ 5–6. The remaining 52 counties conduct English-only elections in that they, among other things, only provide ballots in English and provide limited support for Spanish speakers. This lack of support includes a lack of Spanish sample ballots and a lack of bilingual election personnel. *See generally* ECF No. 2, at 6–7. Plaintiffs have identified 32 such counties with Puerto Rican populations ("the Counties").[6]

Plaintiff Marta Valentina Rivera Madera was born in Santa Isabel, Puerto Rico. ECF No. 25, at ¶ 2. She attended elementary, middle, and high school in San Juan, Puerto Rico where instruction was mostly in Spanish. *Id.* Spanish is her first language and she does not read, speak, or understand English well. *Id.* at ¶¶ 4–5.

In September 2017, Hurricane Maria devastated Puerto Rico. As a direct result of that natural calamity, Ms. Rivera Madera moved to Gainesville, Florida where her daughter lives in October. *Id.* at ¶ 3. Ms. Rivera Madera would like to vote in the November 2018 elections. *Id.* at ¶ 8. She believes she

---

[6] These counties are Alachua, Bay, Brevard, Charlotte, Citrus, Clay, Columbia, Duval, Escambia, Flagler, Hernando, Highlands, Indian River, Jackson, Lake, Leon, Levy, Manatee, Marion, Martin, Monroe, Okaloosa, Okeechobee, Pasco, Putnam, St. Johns, St. Lucie, Santa Rosa, Sarasota, Sumter, Taylor, and Wakulla. Plaintiffs were not able to identify Puerto Rican populations in the remaining 20 Florida counties that conduct English-only elections.

will not be able to vote effectively without access to Spanish-language election materials.

Plaintiffs Mi Familia Vote Education Fund, Hispanic Federation, Faith in Florida, UnidosUS, and Vamos4PR ("Organizational Plaintiffs") are non-profit organizations dedicated to, among other things, community organizing and promoting civic engagement—including voter outreach—in the Latino community. ECF No. 2, Ex. 5, at ¶¶ 2–6, Ex. 6, at ¶¶ 3–6, Ex. 7, at ¶¶ 3–5, Ex. 8, at ¶¶ 3–5, Ex. 9, at ¶¶ 2–4. These organizations have been especially engaged in voter outreach to the Puerto Rican population in Florida following Hurricane Maria. ECF No. 2, at 8. Part of this outreach involves securing Spanish-language ballots and election materials for Spanish-speaking voters in those counties not currently providing those materials. ECF No. 2, Ex. 5, at ¶ 10, Ex. 6, at ¶ 5–6, Ex. 7, at ¶ 5, Ex. 8, at ¶ 6, Ex. 9, at ¶ 6.

Some of the Organizational Plaintiffs have actively sought to secure Spanish-language election materials in Florida counties with large Puerto Rican populations that did not already provide such materials. ECF No. 3, at ¶¶ 4–10. These Plaintiffs sent letters to 13 allegedly non-complying counties in April and followed up in June.[7] *Id*. at ¶¶ 5 & 8. Ultimately, the counties

---

[7] Those counties were Alachua, Brevard, Clay, Duval, Hernando, Highlands, Lake, Leon, Manatee, Marion, Pasco, Sarasota, and St. Lucie. ECF No. 3, at ¶ 5.

declined to commit to providing official Spanish-language ballots for the November 2018 election. *Id*. at ¶ 10.

The Plaintiffs brought suit in this Court on August 16, 2018. Plaintiffs are suing to enforce Section 4(e) of the Voting Rights Act in 32 counties ("the Counties") that contain Puerto Rican populations but currently conduct English-only elections. They move for preliminary injunction and seek to enjoin Defendants to provide bilingual ballots, sample ballots, absentee and early voting applications and ballots, provisional ballots, voter registration forms, voting instructions, voter information, polling place notifications, and polling place signage, to all be created by a certified translator, and to ensure that all election information is digitally available in Spanish. ECF No. 2, at 31.

## II

This Court first addresses Defendant Detzner's motion to dismiss. The Secretary of State predictably attempts to evade federal jurisdiction by challenging Plaintiffs' standing, asserting sovereign immunity, and claiming Plaintiffs have failed to state a claim. ECF No. 42, at 3–15. These arguments are not persuasive.

## A

First, the Secretary of State claims he has no relevant power over the county supervisors of elections. Specifically, Defendant Detzner argues that Plaintiffs have failed to establish the causation element of standing, one of

three necessary requirements for a party to sue another, along with injury and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). This argument is not convincing.

Causation can be established through a party's action or *inaction. See, e.g., Massachusetts v. E.P.A.*, 549 U.S. 497, 523 (2007) (holding that the Environmental Protection Agency's "refusal to regulate" certain emissions contributes to plaintiffs' injury). A party must show "its injury was fairly traceable" to Defendant Detzner. *Hollywood Mobile Estates Ltd. v. Seminole Tribe*, 641 F.3d 1259, 1265 (11th Cir. 2011).[8]

As this Court notes with tiresome regularity, Defendant Detzner is Florida's "chief election officer." Fla. Stat. § 97.012; *see also League of Women Voters v. Detzner*, 314 F. Supp. 3d 1205, 1211 (N.D. Fla. 2018), *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1255 (N.D. Fla. 2016), *and Fla. Democratic Party v. Detzner*, 2016 WL 6090943, at *5 (N.D. Fla. Oct. 16, 2016). This statutory job description is not window dressing. The Secretary of State must "[o]btain and maintain uniformity in the interpretation and implementation of the election laws" and promulgate rules for the "proper and equitable interpretation and implementation" of election laws. Fla. Stat. § 97.012(1).

---

[8] *Hollywood Mobile* is distinguishable because the plaintiffs "failed to allege an action of the Secretary that has caused . . . any injury." *Id*. at 1265–66. There, "the Secretary played no role" in the alleged injury. *Id*. at 1266. Here, Plaintiffs allege Defendant Detzner's actions or lack of actions directly were, at minimum, fairly traceable to their alleged injuries.

Additionally, the Department of State "shall have general supervision and administration of the election laws, corporation laws and such other laws as are placed under it by the Legislature." Fla. Stat. § 15.13.[9]

Under rules the Department of State has promulgated, "[b]allots shall be translated into other languages that are required *by law* or court order." Fla. Admin. Code. R. 1S-2.032 (2018) (emphasis added). This rule is the Secretary of State's own affirmative acknowledgment of his responsibilities, passed pursuant to state law. Fla. Stat. § 97.012(1). There is no qualifying language in the rule. There is no asterisk after the provision stating "except for the Voting Rights Act of 1965." This Court does not—and cannot—read a limitation into this provision.

Defendant Detzner has the responsibility to enforce the Department of State's rules on each county supervisor of elections. Fla. Stat. § 97.012(14). He also has the responsibility to "[p]rovide written direction and opinions to the supervisors of elections on the performance of their official duties with respect to . . . rules adopted by the Department of State." Fla. Stat. § 97.012(16). This responsibility surely includes the Department's affirmative requirement that "[b]allots shall be translated into other languages that are required by law"—such as the 53-year-old Voting Rights Act. Fla. Admin. Code. R. 1S-2.032.

---

[9] The statute refers to all election laws. The modifying phrase "laws as are placed under it by the Legislature" only qualifies "such other laws." Fla. Stat. § 15.13.

Defendant seems to admit as much—"Rule 1S-2.032(3) of the Florida Administrative Code merely tells supervisors to follow the law and court orders." ECF No. 42, at 10.

Accordingly, the Secretary's failure to require or ensure compliance with the Voting Rights Act and the Department of State's own rule is, at a minimum, "fairly traceable" to Plaintiffs' alleged injuries. *Lujan*, 504 U.S. at 590 (internal quotation marks omitted).

**B**

Defendant Detzner's sovereign immunity argument is also unpersuasive for similar reasons. Congress abrogated state sovereign immunity in passing Section 4(e) of the Voting Rights Act. The provision "prohibit[s] the States from conditioning the right to vote of [Puerto Ricans] on ability to read, write, understand, or interpret any matter in the English language." 52 U.S.C. § 10303(e)(1). This unambiguous prohibition on the states from conditioning the right to vote "unequivocally expresse[s]" an intent to abrogate state sovereign immunity. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996); *cf. Lewis v. Governor of Alabama*, 896 F.3d 1282, 1294 (11th Cir. 2018) ("Congress validly abrogated state sovereign immunity in § 2 of the Voting Rights Act."). Moreover, Congress "has acted pursuant to a valid exercise of power." *Id.* Section 4(e) of the Voting Rights Act is a "proper exercise" of Congress's

enforcement power under the Fourteenth Amendment's Section 5. *Katzenbach*, 384 U.S. at 646.

Assuming arguendo that Congress did not abrogate sovereign immunity in passing Section 4(e) of the Voting Rights Act, the *Ex parte Young* doctrine applies. "[T]he principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984). *Ex parte Young*, however, long ago permitted parties to sue state officials for prospective injunctive relief for alleged continuing violations of federal law. 209 U.S. 123 (1908). A state officer falls neatly into the *Ex parte Young* exception to sovereign immunity if "by virtue of his office, [he] ha[s] some connection with the unconstitutional act or conduct complained of." *Luckey v. Harris*, 860 F.2d 1012, 1015–16 (11th Cir. 1988).

As explained above, Defendant Detzner has ample authority to enforce election laws across the state. The Department of State has a rule acknowledging the necessity of bilingual ballots when required by law. Fla. Admin. Code. R. 1S-2.032. Even so, Defendant Detzner argues that he "has no power under state law to compel 32 separately elected constitutional officers to comply with *federal law*." ECF No. 42, at 9 (emphasis in original). Not quite. State law and the Secretary's regulations outlining his responsibilities make clear that he does have power—and responsibility—to comply with federal law.

The Department of State, after all, "shall have general supervision and administration of the election laws." Fla. Stat. § 15.13. Not *some* election laws. *The* election laws. Moreover, Defendant must provide written guidance to county supervisors to comply with Department regulations. Fla. Stat. § 97.012(16). Defendant has the power and responsibility to enforce Department regulations. Fla. Stat. § 97.012(14) (Secretary has responsibility to "[b]ring and maintain such actions at law or in equity by mandamus or injunction to enforce the performance of *any* duties of a county supervisor of elections . . .") (emphasis added). And the regulations require bilingual ballots when "the law"—not just "state law"—requires them.

It is true that *Ex parte Young* may not apply "where the officer who is charged has no authority to enforce the challenged statute." *Summit Med. Assocs. v. Pryor*, 180 F.3d 1326, 1341–42 (11th Cir. 1999). But when Florida's chief election officer's regulations necessitate translated ballots when required by law, then it is evident the state officer has abundant authority to enforce the challenged statute. His authority thwarts his sovereign immunity claim.

### C

Finally, Plaintiffs have stated a claim for relief against the Secretary of State. Plaintiffs allege that Defendant Detzner "authorizes and permits the Counties to provide English-only" materials by "not requir[ing] the Counties to provide bilingual ballots or Spanish-language election materials, instructions,

11

or assistance." ECF No. 1, at 25. Accepting these facts as true—which this Court must do at the motion to dismiss stage, *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)—Plaintiffs have stated a claim for which relief can be granted. To survive a motion to dismiss, Plaintiffs need not provide the name, age, and address of every Puerto Rican in Florida who lacks proficiency in English. Estimates, especially when they come from a qualified expert, provide sufficient basis for stating a claim.

Moreover, as explained above, Defendant is the state's chief election officer and his own regulations call for bilingual ballots when required by law. That Plaintiffs do not live in all 32 counties at issue does not doom their claim because Defendant is a state officer whose responsibilities to provide bilingual ballots when required by law extend across the state.

## III

Plaintiffs seek a preliminary injunction, "an extraordinary and drastic remedy." *Suntrust Bank v. Houghton Mifflin Co.*, 252 F.3d 1165, 1166 (11th Cir. 2001). To succeed on a motion for preliminary injunction, plaintiffs bear the burden of showing they have a substantial likelihood of success on the merits, an injunction is necessary to prevent irreparable harm, the balance of the equities tip in favor of the movants, *and* the injunction would serve the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016). A

preliminary injunction "should not be granted unless the movant clearly carries its burden of persuasion on each of these prerequisites." *Suntrust Bank*, 252 F.3d at 1166. This Court addresses each of the four requirements for the issuance of a preliminary injunction.

## A

Plaintiffs have established a substantial likelihood of success on the merits. The Voting Rights Act is clear. Singling out those "persons educated in American-flag schools in which the predominant language was other than English," the Act "prohibit[s] the States from conditioning the right to vote of such persons on ability to read, write, understand, or interpret any matter in the English language." 52 U.S.C. § 10303(e)(1). No person "shall be denied the right to vote in any Federal, State, or local election because of his inability to read, write, understand, or interpret any matter in the English language" if educated in a school "in which the predominant classroom language was other than English." 52 U.S.C. § 10303(e)(2).[10] Congress explicitly passed Section 4(e) to assist Puerto Rican voters. *Katzenbach*, 384 U.S. at 645 n.3.

---

[10] The Voting Rights Act of 1965 offered these protections to anyone who completed sixth grade in any non-English language school. Following the 1970 amendment the Act, however, Section 4(e) now "prohibit[s] the states from conditioning the right to vote of persons who attended *any number of years* of school in Puerto Rico on their ability to read or understand the English language." *Puerto Rican Org. for Political Action v. Kusper*, 490 F.2d 575, 579 (7th Cir. 1973) (emphasis added); *see also* 52 U.S.C. § 10501 (prohibiting the conditioning of voting rights on the use of "any test or device," including "demonstrat[ing] any educational achievement").

Voting in a language you do not understand is like asking this Court decide the winner of the Nobel Prize for Chemistry—ineffective, in other words. Courts have long held that the right to vote includes not only the right to physically enter a polling place and fill out a ballot but also the right to comprehend and understand what is on that ballot. *See, e.g.*, *Torres v. Sachs*, 381 F. Supp. 309, 312 (S.D.N.Y. 1974) ("In order that the phrase 'the right to vote' be more than an empty platitude, a voter must be able effectively to register his or her political choice."); *Arroyo*, 372 F. Supp. at 767 ("[T]he 'right to vote' means more than the mechanics of marking a ballot or pulling a lever."); *Puerto Rican Org. for Political Action v. Kusper*, 350 F. Supp. 606, 610 (N.D. Ill. 1972) ("The right to vote means the right to effectively register the voter's political choice, not merely the right to move levers on a voting machine or to mark a ballot."). The right to vote, therefore, "encompasses the right to an *effective* vote." *Puerto Rican Org. for Political Action v. Kusper*, 490 F.2d 575, 580 (7th Cir. 1973) (emphasis added).

Courts "broadly interpret[]" Section 4(e) of the Voting Rights Act to proscribe the conditioning of voting rights on a voter's English-language abilities. *United States v. Berks Cty., Pa.*, 250 F. Supp. 2d 525 (E.D. Pa. 2003). "Section 4(e) does not restrict or deny the franchise but in effect extends the franchise to persons who otherwise would be denied it by state law." *Katzenbach*, 384 U.S. at 657. The plain language of this provision ensures that

Puerto Ricans—American citizens, all of them—are not prevented from voting in a language they may not fully understand.

There is no shortage of courts applying this law. A group of Puerto Rican voters in New York City sued under Section 4(e), alleging New York City's English-only elections violated the Act. The district court observed that "[i]t is simply fundamental that voting instructions and ballots . . . must be in Spanish as well as English, if the vote of Spanish-speaking citizens is not to be seriously impaired." *Torres*, 381 F. Supp. at 312. The district court ordered the defendants to "guarantee" Puerto Rican voters "their full rights to an effective vote" and ordered the defendants to provide bilingual election materials. *Id*. at 313. Similarly, a district court determined that Philadelphia's English-only elections meant "plaintiffs cannot cast an 'informed' or 'effective vote without demonstrating an ability to comprehend the registration and election forms and the ballot itself'"—an impermissible conditioning of their right to vote on their ability to read and comprehend English. *Arroyo*, 372 F. Supp. at 767. The court permanently enjoined the city from operating English-only elections and ordered officials to provide Spanish-language ballots and assistance, among other things. *Id*. at 768. Finally, Puerto Rican voters sued Chicago officials alleging violations of Section 4(e), which concluded when a district court ordered remedial measures only eight days before the November 1972 elections. *Kusper*, 350 F. Supp. at 606.

15

Nothing in Section 4(e)'s plain language indicates any numerical threshold to trigger its protections. No court has even hinted that Section 4(e) contains a numerical requirement. Defendants in *Berks County* claimed that Section 4(e) could "lead to the eventual result that bilingual ballots and voting materials be provided in every voting precinct in the country with even a single limited-English proficient voter of Puerto Rican descent, educated in Spanish in an American-flag school in Puerto Rico." *Berks Cty.*, 250 F. Supp. 2d at 537. The district court observed that not all the precincts the community at issue were the target of the plaintiff's proposed injunctive relief. Even so, the court was "guided by the plain language of Section 4(e)," which it found clear and due to be interpreted according to its plain meaning. *Id*.

Here, Plaintiffs only request a preliminary injunction for the Counties that contain Puerto Rican populations who were either born in Puerto Rico or speak English less than "very well." This request is fewer than the 52 Florida counties that conduct English-only elections. Plaintiffs tailored their lawsuit to exclude the remaining 20 counties, which presumably have a de minimis Puerto Rican population, if any.

Meanwhile, Plaintiffs offer more-than-competent evidence that thousands of citizens in the Counties speak English less than "very well." ECF

No. 2, Ex. 2 ("Smith Report").[11] First, expert Dr. Daniel Smith draws from the 2015 American Community Survey of the United States Census Bureau and determines that more than 30,000 individuals of Puerto Rican heritage lack full English proficiency. *Id.* at 7–8. Additionally, Dr. Smith examined the number of Florida voters born in Puerto Rico. In November 2017, there were approximately 200,000 registered voters in Florida who were born in Puerto Rico. More than 36,500 of them currently live in one of the 32 counties at issue in this case. *Id.* at 10–13.

Defendant Detzner argues these numbers fail to clearly establish a likelihood of success on the merits because Dr. Smith's analysis involved estimates, degrees of uncertainty, and qualifying language such as "more likely than not." ECF No. 42, at 17. This argument is faulty for the simple reason that large datasets of populations almost always include estimates or degrees of uncertainty. Taking Defendant's argument to its logical endpoint would mean that the American Community Survey—or any data that includes estimates or degrees of uncertainty, even if they run through the analysis of a respected political scientist—can never be used as evidence in a court's consideration of a preliminary injunction.

---

[11] This Court finds Dr. Smith's report to be credible, his methodology sound, and his sources, such as the American Community Survey, to be reliable. Defendant Detzner attempts to paint Dr. Smith as having "no obvious expertise in . . . statistics, demographics, or linguistics." ECF No. 42, at 17. A quick glance at Professor Smith's 18-page curriculum vitae will suggest fewer more qualified individuals to provide expertise on the subject of this litigation.

This Court recognizes some caveats about the numbers Plaintiffs' expert proffers. First, there is likely significant overlap between two groups of Puerto Rican individuals Dr. Smith identifies; many of the registered voters identified as born in Puerto Rico may also speak English less than "very well." Second, this Court recognizes these numbers represent conservative estimates. *See, e.g.*, Smith Rep., at 12 (noting that some registration forms analyzed are more than six months old and do not include any Puerto Ricans who relocated after Hurricane Maria). It is no secret that thousands of Puerto Ricans have moved to Florida in recent years, particularly in the devastating wake of Hurricane Maria and the controversial government response to the disaster.[12] Many, like Ms. Rivera Madera, have moved here permanently. The American Community Survey from 2015 necessarily does not include these 2017 and 2018 transplants.

As noted above, Section 4(e) does not contain a numerical threshold to trigger its protections. There may be understandable consternation about

---

[12] *See, e.g.*, Mary Shankin & Ahelaide Chen, *Puerto Rican Population Growth Reshapes Central Florida*, Orlando Sentinel (Dec. 7, 2017), http://www.orlandosentinel.com/classified/realestate/os-bz-florida-county-puerto-rican-population-growth-20171207-story.html; Elise Vieback, & Joel Achenbach, *Puerto Ricans Are A Surging, Outraged Political Force in Florida in the Aftermath of Maria*, WASH. POST (Oct. 6, 2017), https://www.washingtonpost.com/powerpost/in-florida-puerto-ricans-are-a-surging-political-force--and-outraged-by-trumps-response-to-maria/2017/10/06/e7389e7a-aa29-11e7-b3aa-c0e2e1d41e38_story.html; Michael Tackett, *An Exodus From Puerto Rico Could Remake Florida Politics*, N.Y. TIMES (Oct. 6, 2017), https://www.nytimes.com/2017/10/06/us/politics/puerto-rico-florida-voters.html; Kenya Downs, *Puerto Rican Voter Surge in Florida is No Surprise*, PBS.org (Nov. 8, 2016), https://www.pbs.org/newshour/politics/is-puerto-ricans-movement-to-mainland-swaying-elections.

expending resources to accommodate what may be a handful of registered voters. For example, Dr. Smith identifies 24 adults of Puerto Rican heritage who speak English less than "very well" in Wakulla County, Florida; just four voters in Taylor County were born in Puerto Rico. *Id.* at 15 & 9. Even so, this Court cannot read any numerical requirements into Section 4(e)'s plain language. Moreover, Plaintiffs have tailored their claims to only 32 counties. In addition to 13 counties covered by another provision of the Voting Rights Act, *see supra* at 3, and two counties not covered by this provision that nevertheless provide Spanish ballots, there remain 20 counties that are not impacted by Plaintiffs' claims. Presumably, these counties have a negligible non-English-speaking Puerto Rican population and therefore do not require Spanish election materials, even under the plain language of Section 4(e).

In 2013, African Americans were relieved to learn that "things have changed" in the South in terms of voting rights. *Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 547 (2013); *but see N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016) (describing how North Carolina election laws passed on the day after *Shelby County* decision "target[ed] African Americans with almost surgical precision"); *Veasey v. Abbott*, 830 F.3d 216, 264–65 (5th Cir. 2016) (affirming finding that Texas voter identification law had "a discriminatory effect on minorities voting rights in violation of Section 2 of the Voting Rights Act"); *Terrebone Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d

395, 462 (M.D. La. 2017), *appeal dismissed sub nom. Fusilier v. Edwards*, 2017 WL 8236034 (5th Cir. Nov. 14, 2017) (finding racially discriminatory purpose in maintaining at-large judicial districts); *Perez v. Abbott*, 253 F. Supp. 3d 864, 955 (W.D. Tex. 2017) ("The Court finds that this evidence persuasively demonstrates that mapdrawers intentionally packed and cracked on the basis of race (using race as a proxy for voting behavior) with the intent to dilute minority voting strength."); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 728 (S.D. Tex. 2017) (finding city council's electoral scheme "disproportionately and discriminatorily dilute[d] Latino minority voting strength" in violation of the Fourteenth Amendment). While the Supreme Court invalidated Section 4(b) of the Voting Rights Act pursuant to that astute observation, the voting rights of Puerto Ricans remain explicitly protected by Section 4(e). If and until the day comes when those protections are invalidated by something like the heretofore unknown "tradition of equal sovereignty" among the states, *Shelby Cty.*, 570 U.S. at 544, the plain meaning of Section 4(e) controls. Spanish-language voting materials for Spanish-speaking American citizens educated in Puerto Rico means Spanish-language voting materials for Spanish-speaking American citizens educated in Puerto Rico. "Section 4(e) thereby enables the Puerto Rican minority better to obtain perfect equality of civil rights and the equal protection of the laws." *Katzenbach*, 384 U.S. at 652–53.

**B**

Plaintiffs must also demonstrate they will suffer irreparable injury without a preliminary injunction. *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)).

"An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987) (quoting *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983)). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). Accordingly, irreparable injury is presumed when "[a] restriction on the fundamental right to vote" is at issue. *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). Once the election comes and goes, "there can be no do-over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). As this Court explained in another elections-related preliminary injunction order, "[t]his isn't golf: there are no mulligans." *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1258 (N.D. Fla. 2016).

Here, a preliminary injunction would prevent harm in the form of an English-only election for thousands of citizens who speak English less than "very well"—if at all. These individuals would face the false decision to vote in

21

a manner they do not meaningfully comprehend or not vote at all. That decision is antithetical to what our democratic government stands for. In short, Plaintiffs have established that they would suffer irreparable harm in the absence of a preliminary injunction.

## C

In considering the balance of the equities, this Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987).

If this Court denies all relief to Plaintiffs, they will lose their right to a meaningful vote. ECF No. 25, at ¶¶ 5 & 8. This Court would, in effect, be authorizing disenfranchisement.[13] If this Court grants all Plaintiffs' requested relief, Defendants will be required to spend considerable time and effort to comply with the Voting Rights Act. They would have to do so in the lead-up to the November general election, which involves significant planning, logistics, and oversight—all of which is well-documented in the record.

A state "indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco Cty. Democratic Cent.*

---

[13] This Court notes that Plaintiffs have not sat on their rights. They filed this lawsuit only after reaching out to the Counties to comply with Section 4(e); many Counties politely rebuffed Plaintiffs or demurred. *See, e.g.*, ECF No. 3, Exs. N–X & LL–PP. In short, Plaintiffs have acted with "reasonable diligence." *Benisek v. Lamone*, 138 S.Ct. 1942, 1944 (2018).

*Comm.*, 489 U.S. 214, 231 (1989). The risk that "orderly elections" would be disrupted by granting all of Plaintiffs' requested relief is not trivial. *Benisek*, 138 S.Ct. at 1944.

This Court has reviewed the many pages of affidavits and testimony from Florida's election officials and agrees that granting all of Plaintiffs' requested relief would place significant hardships on election administrators. *See generally* ECF Nos. 40 & 42, Exs. 1 & 2. For example, Director of Elections Maria Matthews explains that preparing ballots is "a critical, complex, and detail-oriented process" wherein each precinct may need a different ballot style and contents. ECF No. 42, Ex. 1, at ¶ 14. Requiring official bilingual or separate Spanish ballots would, in the testimony of one Alachua County official, be "technologically and practically impossible" in time for the November 2018 elections. ECF No. 41, Ex. 2, at ¶ 5. A bilingual ballot would "radically alter[] the ballot layout" and would "require[] a larger ballot for an election than the equivalent English only ballot"—a change county officials simply do not have the time and resources to implement. *Id.* at ¶ 7. Similarly, a separate Spanish ballot would require significant software changes, which would then necessitate testing and verification—time and resources the county does not have. *Id.* at ¶ 8. Some counties already have ordered supplies, others have already begun training poll workers, and many county supervisors explain their budgets have already been set for the current election cycle.

Courts have recognized that preliminary injunctions before elections will "place administrative and financial burdens" on non-complying jurisdictions. *Johnson v. Halifax Cty.*, 594 F. Supp. 161, 171 (E.D.N.C. 1984). "Such burdens, however, are not . . . undue in view of the otherwise irreparable harm to be incurred by plaintiffs." *Id*. Administrative expense, in other words, is "far out-outweighed by the fundamental right at issue." *Berks Cty.*, 250 F. Supp. 2d at 541; *see also United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012) (describing administrative, time, and financial burdens as "minor when balanced against the right to vote, a right that is essential to an effective democracy"). If the issue here was purely financial, this Court might be singing a different tune.

This Court must balance the plain language of the Voting Rights Act's Section 4(e) guaranteeing Puerto Ricans a right to a meaningful vote against the considerable logistical, financial, and technological hurdles that hard-working and dedicated election officials face at this juncture in the election cycle. While other district courts in past decades have afforded relief on tighter timelines under different circumstances, *see Berks Cty.*, 250 F. Supp. 2d at 541 (justifying, in part, preliminary injunction issued two months before election by citing other injunctions issued within 24, 18, and eight days before election), this Court is persuaded by the numerous affidavits stating that granting all of

Plaintiffs' requested relief would be impossible—or close to impossible—under the unique facts of Florida's election administration system in the fall of 2018.

## D

The public interest is always served by more equitable, easier access to the ballot. Additionally, state and local officials serve the public interest when they conform their conduct to federal law's requirements. This is especially so when the law is so clear in its requirements. "Ordering Defendants to conduct elections in compliance with the Voting Rights Act so that all citizens may participate equally in the electoral process serves the public interest by reinforcing the core principles of our democracy." *Berks Cty.*, 250 F. Supp. at 541. This interest includes access to the ballot in a language the voter can comprehend.

## IV

It is remarkable that it takes a coalition of voting rights organizations and individuals to sue in federal court to seek minimal compliance with the plain language of a venerable 53-year-old law. Due to the timeline of this lawsuit and the looming deadlines Florida election officials face, this Court does not order all of Plaintiffs' requested relief. Rather, it orders attainable compliance with Section 4(e). In doing so, this Court recognizes that some counties already provide some of the services this Court orders.

Accordingly,

**IT IS ORDERED**:

1. Consistent with the Secretary of State's responsibility to "provide written direction . . . to the supervisors of elections on the performance of their official duties with respect to . . . rules adopted by the Department of State," Fla. Stat. § 97.012(16), and the Department of State's rule that "[b]allots shall be translated into other languages that are required by law or court order," Fla. Admin. Code. R. 1S-2.032, the Secretary shall provide written direction to the supervisors of elections in the 32 counties identified *supra* at 4 n.6 as follows:

   a. The Supervisor of Election shall make available a facsimile sample ballot in Spanish to voters who fall within the ambit of Section 4(e) of the Voting Rights Act. The sample ballots shall have matching size, information, layout, placement, and fonts as an official ballot does. The sample ballots need not be completely identical; for example, the sample ballot need not contain bar codes or other markings that official ballots may have or be printed on the same stock, etc.

   b. As to render the above a meaningful remedy, the Supervisor of Election shall publish the same facsimile sample ballot on their website with Spanish-language directions. To the extent English-language sample ballots are mailed, published, or advertised, such sample ballots must also include the sample Spanish-language ballot. The Supervisor of Election shall also provide signage in Spanish at polling places making voters aware of such sample ballots.

   c. This Order does **not** preclude additional measures to provide assistance, as is currently being implemented under Supervisor Barton, such as hiring additional bilingual poll workers,

creating or staffing a bilingual voter assistance hotline, offering bilingual assistance to disabled Spanish voters, or publishing bilingual voter guides.

2. The Secretary of State shall copy this Order in his written direction to the supervisors of elections.

3. The Secretary of State shall provide this Court notice of compliance with this Order on or before Wednesday, September 12, 2018.

4. The Secretary of State's motion to dismiss, ECF No. 42, is **DENIED**.

5. Plaintiffs' motion for preliminary injunction, ECF No. 2,  is **GRANTED in part** and **DENIED in part**. It is **GRANTED** insofar as the Counties shall provide signage, sample facsimile ballots, and notice in Spanish on their websites. It is **DENIED** insofar as the Counties shall not be required to provide official Spanish-language ballots and such other relief requested by Plaintiffs which this Court deems infeasible at this late juncture.

**SO ORDERED on September 7, 2018.**


<u>**s/Mark E. Walker**         </u>
**Chief United States District Judge**

27